UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| LEETIS BYRD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case number 1:04cv0121 TCM |
| | ) |
| THE GATES CORPORATION, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Gates Corporation, Inc., ("Defendant") moves for summary judgment on the complaint filed by a former employee, Leetis Byrd ("Plaintiff"), alleging he was discharged because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and of the Missouri Human Rights Act (MHRA), Mo.Rev.Stat. §§ 213.010-.137.[1]

## Background

Plaintiff, born on October 14, 1947, began working for Defendant as a machine operator at its Charleston plant on August 11, 1981. (Pl. Dep. at 7, 13; Def. Ex. 31.) On September 25, 2002, he was discharged by the plant's Production Manager, Jim Callaway,

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

and Human Resources Manager, Bruce Chapman. (Def. Ex. 31.) Plaintiff was then 54 years old and was 19 days shy of being eligible for retirement benefits. (Facts, ¶¶ 95, 96.[2])

Twelve days before his discharge, on September 13, a high temperature dye block weighing between 15 and 37 pounds, struck Plaintiff in the right foot above the steel toe of his boot. (Pl. Dep. at 161; Callaway Aff., ¶6.) At the time, Plaintiff was a machine operator on the "spiral line." (Pl. Dep. at 42.) This job consisted of processing slab stock through various machines that would eventually form the stock into a rubber hose to be vulcanized. (Pl. Dep. at 43-45.) At one point, the process required the use of a dye block and dye insert to coat the initial rubber hose with the desired color. (Id. at 46-48.) If the color was to be changed or if there were unwanted variations in the color, the dye block would be removed from its housing and changed or cleaned. (Id. at 45-47.) Plaintiff testified that he was attempting to remove the dye block on September 13 when it fell, hitting him on the right foot. (Id. at 136.) The impact caused him temporary pain, but no injury. (Id.) The severity of the incident was described on a report form as "near miss." (Pl. Dep. Ex. 10.)

The initial incident report prepared by Defendant's investigators attributed the accident to an "unsafe condition" that was not the fault of Plaintiff. (Def. Ex. 28; Callaway Dep. at 39-40.) This report was based only on what Plaintiff told the investigators. (Facts ¶ 54.) The incident report was revised, however, and the cause of the accident was then

---

[2]"Facts" refers to Defendant's Statement of Uncontroverted Material Facts. Plaintiff has not specifically controverted any of the allegations in Defendant's Statement. Pursuant to E.D.Mo. L.R. 4.01(E), the allegations are therefore deemed admitted for purposes of the instant motion.

attributed to an "unsafe act," thereby placing fault for the accident on Plaintiff. (Callaway Dep. at 39-40; Chapman Dep. at 41-43.) The "root cause" was described as "[o]perator was not aware that the die [sic] block was already loose when he let go to lay his towel down. When he turned back to reach for the block it fell out on his foot." (Pl. Dep. Ex. 10.) The form report had a box for "Age." (Id.) Plaintiff's age was listed as 54. (Id.) Chapman noted a question on this second incident report: "Why did we lay the towel down! These statements seem to say different things." (Id.; Chapman Aff. ¶ 4; Facts ¶ 61.) Consequently, Chapman and one of the three original investigators investigated the accident. (Facts ¶ 66.) Based on their investigation, another of the three original investigators issued a third incident investigation report. (Facts ¶ 68; Def. Ex. 12.) This incident report was identical to the second with one notable exception. The "root cause" was unambiguously attributed to Plaintiff's error in turning loose of the dye block to lay the towel down. (Id.) "[Plaintiff] was not attentive and or aware of surroundings of job at hand." (Id.)

When explaining how the accident happened, Plaintiff contradicted himself several times as to whether he was pulling the block out or pushing it back in, but ultimately contended that the hot dye block fell out while he was attempting to push it back in. (Pl. Dep. at 135-37, 155, 157-58, 160, 168-70; Pl. Dep. Ex. 28; Pl. Dep. Ex. 12.) Plaintiff maintained that his hands were burning due to the holes in his thin gloves. (Pl. Dep. at 130-138.) He had requested new gloves from two supervisors over a three-day span prior to the date of the accident. (Id.)

This accident was Plaintiff's eighth in twenty-one years of continuous employment by Defendant. (Def. Ex. 31.)

After his seventh accident, in November 1998, Plaintiff met with Defendant's human resources manager and two other individuals. The subject of the meeting was Plaintiff's "history of unsafe acts." (Def. Ex. [6].) Those acts were outlined as follows:

> 08/13/83 – Cut to right index finger. In the process of cutting a splice out of a piece of stock with his left hand, [Plaintiff] cut his right index finger.
>
> 03/20/85 – Laceration to forehead area. [Plaintiff] did not observe immediate surroundings in work area and bumped his head on steel beam.
>
> 07/24/91 – Fall, scrap to right leg. [Plaintiff] did not observe immediate surroundings in work area and fell over wire basket.
>
> 12/10/91 – Puncture wound on hip. [Plaintiff] failed to clean up water in his immediate work area therefore creating a unsafe working condition and subsequently slipped in the water causing injury to himself.
>
> 08/22/91 – Fall. [Plaintiff] failed to clean up his immediate work area and slipped in oil.
>
> 11/17/95 – Cut, bruise, puncture to finger. [Plaintiff] was operating a machine without the required safety guard.
>
> 11/17/98 – Bruise, contusion, cut right wrist. [Plaintiff] stuck his hand into a machine to remove a part while the machine was running and in motion.

The Documentation of Meeting, signed by Plaintiff and three other individuals, concluded with this caution: "…[Plaintiff] fully understands that his past history of unsafe acts is unacceptable. If in the future, [Plaintiff] fails to follow proper safety procedures or is observe [sic] committing another unsafe act, further corrective actions will result up to and including termination of employment." (Id.)

This Documentation was not issued pursuant to any policy. (Facts ¶¶ 16, 121.) Nor was the caution included pursuant to any policy. (Facts ¶¶ 14, 15.) Moreover, although the production manager at the time, James Callaway, receives a prepared report for accidents that occur at the Charleston plant, there is no set policy regarding how many safety warnings an employee can receive without being terminated, nor is there a set policy for how many "final warnings" an employee may receive for safety incidents before being terminated. (Id. ¶¶ 53, 121.) Instead, an employee at the Charleston plant can be fired for a single safety violation or, after having been placed on a "safety goal," can violate that goal and not be fired. (Id. ¶¶ 14, 15.)

Callaway became the production manager of the Charleston plant in August 1999. (Id. ¶ 8.) In April 2002, the Charleston plant was found to be the worst or second worst performing plant in the area of safety of the ten plants in its division. (Id. ¶ 14.) The next month, Bob Atwood was named as plant manager, bringing with him a focus on safety. (Id. ¶¶ 6, 25, 26.) Shortly after his arrival, Atwood told Callaway that his safety record was the worst of the ten production managers and that the record had to improve. (Id. ¶ 26.)

As noted above, after the September 2002 accident, Callaway and Chapman met with Plaintiff and informed him that his employment with Defendant was terminated. (Facts ¶ 79.) Plaintiff's position was filled by Tony Cogdill, born on November 16, 1955, and eight years younger than Plaintiff. (Id. ¶ 93.)

In its motion for summary judgment, Defendant argues that this focus on safety combined with Plaintiff's eighth accident following a warning that his next would result in

his termination is the true, non-discriminatory reason for that termination. Plaintiff counters that the true reason is his age. To support this contention, Plaintiff cites his record and the safety record of other, younger workers that were not fired.

Rhonda Palmer was involved in two workplace accidents within ten months: one on May 18, 2002, and the other on February 26, 2003. (Facts ¶¶ 100, 102.) In the first accident, Palmer injured her arm and hand when she attempted to adjust a piece of machinery with her hand rather than a wrench. (Callaway Att. 2.) "Medical [t]reatment" is listed in the box labeled "Severity of Incident." (Id.) In the box labeled "Age," the number 29 is listed. (Id.) Palmer was then given a written safety goal. (Pl. Dep. Ex. 2.) "Any documentation issued to an employee addressing a safety issue is a 'safety goal.'" (Facts ¶ 17.) This written goal included the caution that further safety issues could result in, among other things, termination. (Pl. Dep. Ex. 2.) Palmer disputed the negative assessment, arguing that everyone uses their hands to adjust the machinery at issue and she was trained to use her hand. (Pl. Dep. Ex. 2.) Palmer cut off the tip of her left middle finger nine months later when she was cutting stock. (Callaway Att. 2; Facts ¶ 102.) The "Severity of Incident" was "Medical Treatment." (Callaway Att. 2.) The "Age" box on the incident report listed "29." (Id.) The written report given Palmer following this incident was titled "1st Goal: Safety Job Performance," and included the caution that another safety issue or a failure to meet her goal could result in, among other things, termination. (Id.) Palmer is still employed at the Charleston plant. (Facts ¶ 103.)

Roy Dale Norton was involved in five accidents over the four-year span from 1999 through 2002. (Facts ¶¶ 105-09). He was issued a written safety goal on December 7, 1999. (Id. ¶ 105.) This document referred to three "unsafe acts": a slip on some water (the date of the accident is not included); a burn to his right eye from "lube" on June 3, 1999; and a sprained ankle on November 19. (Id.) This written goal cautioned Norton that further safety violations could result in termination. (Id.) The document was signed by Norton and Chapman. (Id.) Eights day later, Norton injured his left thumb when attempting to cut a piece of stock. (Callaway Att. 4.) Medical treatment was necessary. (Id.) Norton was not fired. The accident report form did not request Norton's age. (Id.) On June 30, 2001, Norton was driving a forklift, did not see a piece of wood lying in the aisle, and knocked over a guard rail when he applied the brakes to avoid hitting the wood. (Callaway Att. 5.) The "Severity of Incident" was described as "Near Miss." (Id.) The incident was reported on the form including a box labeled "Age." (Id.) Norton was 32. (Id.) His age was listed as "33" on the incident investigation report completed on March 20, 2002, after Norton was struck in the mouth by a crank when he was trying to see why the crank had not engaged. (Callaway Att. 6.) Medical treatment was necessary. (Id.) Norton was not then reporting to Callaway; rather, he was reporting to the Charleston distribution manager. (Facts ¶ 108.) Two months later, on May 9, Norton slipped and fell when climbing a stack of pallets used in place of stairs. (Facts ¶ 109; Callaway Att. 7.) This incident was attributed to an "unsafe condition" and not to any fault of Norton. (Id.) Again, he was reporting at that time to the

distribution manager and not to Callaway. (Id.) Norton is still employed at the Charleston plan. (Id. ¶ 110.)

Walter Bryars was involved in three "unsafe acts" resulting in workplace accidents over a three-and-one-half year span. (Facts ¶¶ 111-115.) An accident report form described a fall on November 12, 1999, when Bryars slipped on some ice. (Callaway Att. 8.) This form did not request Bryars' age. (Id.) His second act was on August 20, 2000, when he hurt his back pulling apart slab stock that he should have cut. (Id.; Facts ¶ 112.) The act was reported on an incident investigation report that listed "0" in the box labeled "Age." (Callaway Att. 9.) The "Severity of Incident" was "First Aid." (Id.) On May 5, 2002, Bryars injured his knee when he pinned it between a flatbed and safety railing. (Callaway Att. 10.) His age was listed as 28; the cause was described as an "unsafe act"; and the severity of incident was first aid. (Id.) Three days later, Bryars was issued a "1st Written Goal: Safety." (Pl. Ex. 5.) This document included a caution that further safety violations could result in his termination. (Id.)

Danny Hopper was involved in four unsafe acts resulting in workplace accidents in the period from August 1999 to November 2001. (Facts ¶¶ 116-123.) On November 6, 2001, Hopper was issued a written safety goal following a meeting with Callaway and James Moss. (Pl. Dep. Ex. 7.) This document listed the four acts: one on August 17, 1999, resulting in no injuries; one on April 17, 2001, resulting in a pulled muscle; one on September 8, 2001, resulting in an injured knee that necessitated one day off and three days of light duty; and one on November 2, 2001. (Id.) This document also cautioned Hopper

that further unsafe acts could result in the termination of his employment. (Id.) On July 19, 2002, however, Hopper was seen not following the proper procedure when dumping a scrap container. (Pl. Ex. 8.) This observation resulted in a "Final Warning" being issued to him. (Id.) The final sentence of this warning reads, in bold print: "Termination of employment *will* result." (Id.; emphasis added.) This "Final Warning" is the only such warning that Callaway has issued. (Facts ¶ 120.) Hopper, born on December 5, 1955, was 51 years of age at the time. (Moss Aff. ¶ 5.) He has not had an accident since, and is still employed by Defendant. (Facts ¶¶ 122-23.)

Plaintiff also cites two performance evaluations in support of his argument that Defendant's proffered reason for his termination is pretextual. One evaluation was completed on October 29, 2000, and assessed Plaintiff's rating as being $26^{3}$ out of 30. (Pl. Dep. Ex. 26.) He was rated 9 out of 10 in the area of safety. (Id.) A notation reads: "Safety: No Accidents Good Job keep it up!" (Id.) On September 2, 2002, Plaintiff's "Overall Associate Rating" was 27 out of 30.[4] (Pl. Ex. 19.) This score placed him in the "High Range" of performance. (Id.) A notation read: "Safety: [Plaintiff] has -0- accidents for this evaluation period and is safety conscious." (Id.) Eleven days later, the dye block dropped on Plaintiff's foot and he was fired by the end of the month. Callaway avers that

---

[3]A score of ten in each of three areas is the highest score possible. (Id.) Plaintiff scored two "9's" and one "8," which would total 27 rather than 26. The discrepancy is not relevant.

[4]Again, the individual scores, three scores of nine, add up to one more point than reflected in the total. This discrepancy is also not relevant.

"…it was apparent [Plaintiff] did not have the ability to work safely or maybe the willingness to work safely." (Def. Ex. 31.)

## Discussion

Summary Judgment Standard.  Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986).  "A plaintiff facing a summary judgment motion cannot 'get to the jury without any significant probative evidence tending to support the complaint[,]'" but must "make a sufficient showing on every essential element of its claim on which it bears the burden of proof." **Buettner v. Arch Coal Sales Co.**, 216 F.3d 707, 718 (8th Cir. 2000) (alteration added) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

And, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998). "Mere allegations not supported with specific facts are insufficient to establish a material issue of fact[.]" **Henthorn v. Capitol Communications, Inc.**, 359 F.3d 1021, 1026 (8th Cir. 2004) (alteration added). "Only admissible evidence may be used . . ., and affidavits must be based on personal knowledge." **Id.** (alteration added) (interim citations omitted). See also **Stanback v. Best Diversified Products, Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion). All disputed facts are to be resolved, however, and all inferences are to be drawn in favor of the non-moving party. See **Ghane v. West**, 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993).

Additionally, summary judgment should seldom be granted in cases alleging employment discrimination. See **Luciano v. Monfort, Inc.**, 259 F.3d 906, 908 (8th Cir. 2001); **Bradley v. Widnall**, 232 F.3d 626, 630-31 (8th Cir. 2000); **Keathley v. Ameritech Corp.**, 187 F.3d 915, 919 (8th Cir. 1999). This is so "[b]ecause employment discrimination cases frequently turn on inferences rather than direct evidence," **Bell v. Conopco, Inc.**, 186 F.3d 1099, 1011 (8th Cir. 1999) (alteration added), and are inherently fact based, **Keathley**, 187 F.3d at 919. Summary judgment is appropriate in employment discrimination cases,

however, "where there are no disputed facts and only one conclusion is possible." **Woods v. Perry**, 375 F.3d 671, 674 (8th Cir. 2004). See also **Pope v. ESA Servs., Inc.**, 406 F.3d 1001, 1006 (8th Cir. 2005) ("[T]his Court also has noted that there is no discrimination exception to the application of Fed.R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." (alteration added; interim quotations omitted)).

<u>Age Discrimination Claim.</u>  The ADEA prohibits an employer from terminating an employee because of the employee's age.  29 U.S.C. § 623(a)(1).  It is well established that claims under the MHRA are analyzed the same as claims under the ADEA.  See **Denesha v. Farmers Ins. Exchange**, 161 F.3d 491, 497 (8th Cir. 1998); **Fast v. Southern Union Co.**, 149 F.3d 885, 889 (8th Cir. 1998); **Kneibert v. Thomson Newspapers, Michigan Inc.**, 129 F.3d 444, 451 n.3 (8th Cir. 1997).  Because Plaintiff has presented no direct evidence of intentional age discrimination, his claims are analyzed under the *McDonnell Douglas*[5] burden-shifting framework.  **Haas v. Kelly Servs., Inc.**, 409 F.3d 1030, 10335 (8th Cir. 2005); **Mayer v. Nextel West Corp.**, 318 F. 3d 803, 806 (8th Cir. 2003); **Britton v. City of Poplar Bluff, Mo.**, 244 F.3d 994, 996-97 (8th Cir. 2001).  This framework first requires Plaintiff to "establish a prima facie case of age discrimination by showing he (1) was at least 40 years old, (2) was terminated, (3) was meeting [his employer's] reasonable expectations at the time of his termination, and (4) was replaced by someone substantially younger."

---

[5]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).

**Mayer**, 318 F.3d at 807 (alteration added) (citing McDonnell Douglas, 311 U.S. at 802). The proof of a prima facie case is satisfied by a "minimal evidentiary showing." **Pope**, 406 F.3d at 1007. Moreover, "[t]he proof . . . is not inflexible and varies somewhat with the specific facts of each case." **Id.** at 1008 (alterations added; interim quotations omitted).

"Upon establishing a prima facie case of discrimination, the burden of production shifts to the defendant to show that it had a legitimate, nondiscriminatory reason for its actions." **Id.** at 1007. "Once this burden has been met, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination. At all times, the burden of persuasion remains with the plaintiff." **Id.** (interim citations omitted). Accord **Mayer**, 318 F.3d at 807. "Merely disputing [the employer's] reason is insufficient, however. [The plaintiff] must show both that the reason was false, and that discrimination was the real reason." **Stuart v. General Motors Corp.**, 217 F.3d 621, 634 (8th Cir. 2000) (alterations added; interim quotations omitted). Often "'the employer's proffered reason [for discharging the employee] is that the employee was not performing the job satisfactorily, which is simply the negative of one of the elements of the prima facie case.'" **Cherry v. Ritenour School Dist.**, 361 F.3d 474, 479 (8th Cir. 2004) (quoting Erickson v. Farmland Indus., Inc., 271 F.3d 718, 726 (8th Cir. 2001)) (alteration added). "[T]he presumptive case requires only a minimal showing, while a showing of pretext requires more substantial evidence." **Id.** (alteration added) (citing Erickson, 271 F.3d at 726-27). And, "[a]lthough it is possible for strong evidence of a prima facie case to also

present a factual issue on pretext, the ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff]." **Kiel v. Select Artificials, Inc.**, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (citations and quotations omitted) (first alteration added, others in original). "The evidence supporting the plaintiff's prima facie case may suffice[, however,] to discredit the defendant's explanation, and the plaintiff is not required in all cases to introduce additional evidence to meet the burden of proof." **Peterson v. Scott County**, 406 F.3d 515, 521 (8th Cir. 2005) (alteration added). "[T]he ultimate burden of persuading the factfinder of intentional age discrimination rests with [the plaintiff] at all times." **Mayer**, 318 F.3d at 807 (alterations added). Accord **Haas**, 409 F.3d at 1036.

Defendant does not dispute that Plaintiff satisfies the first and third elements of a prima facie case. Rather, Defendant argues that Plaintiff was not meeting its reasonable safety expectations and was not replaced by someone substantially younger.

As noted above, Defendant's reason for discharging Plaintiff is the negative of the second element – he was performing the job satisfactorily – and will be discussed below in the context of whether the reason is a pretext for intentional age discrimination.

The fourth element is whether Plaintiff was replaced by "someone substantially younger." **Haas**, 409 F.3d at 1035. It is undisputed that Plaintiff was replaced by a man

eight years younger than he. "The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of his age." **O'Connor v. Consolidated Coin Caterers Corp.**, 517 U.S. 308, 312 (1996) (alteration added). The Eighth Circuit Court of Appeals has held that a replacement employee five years younger than the plaintiff is not "substantially younger" for purposes of establishing the fourth element of a prima facie case. **Schiltz v. Burlington Northern R.R.**, 115 F.3d 1407, 1413 (8th Cir. 1997). The Eighth Circuit has also noted that the question of a six-year difference is a "close one, and one that is not entirely free from doubt." **Hammer v. Ashcroft**, 383 F.3d 722, 726 n.3 (8th Cir. 2004). In **Grosjean v. First Energy Corp.**, 349 F.3d 332, 336-40 (6th Cir. 2003), the Sixth Circuit Court of Appeals collected cases on how great an age difference satisfied the "substantially younger" requirement. The Court noted that age differences of ten or more years were generally sufficient to satisfy the requirement. **Id.** at 336. The Court further noted that one Circuit, the Seventh Circuit in **Hartley v. Wisconsin Bell, Inc.**, 124 F.3d 887 (7th Cir. 1997), adopted a steadfast rule that "substantially younger" is at least ten years. **Grosjean**, 349 F.3d at 338. Although "only a handful of cases in a few categories have been decided contrary to the Hartley rule," "[a]ge differences of 8 or 9 years have been held to be sufficient." **Id.** at 339 (alteration added) (citing, inter alia, Sixth and Second Circuit cases finding that an eight-year difference was sufficient). In **Girten v. McRentals, Inc.**, 337 F.3d 979, 982 (8th Cir. 2003), the Eighth Circuit questioned whether a nine-year difference was sufficient to infer age discrimination.

In the instant case, the Court finds it unnecessary to reach the issue whether a bright-line rule that an eight-year difference is insufficient should apply. The ten-year rule of the Seventh Circuit is only a presumption. **Hartley**, 124 F.3d at 893. "In cases where the disparity is less [than ten years], the plaintiff still may present a triable claim if []he directs the court to evidence that [his] employer considered [his] age to be significant." **Id.** (alterations added).

Defendant argues that Plaintiff was terminated because of his poor safety record. Clearly, this is a non-discriminatory reason for the adverse employment action. In November 1998, before the arrival of either Callaway or Atwood, Plaintiff met with Defendant's human resources manager and two other individuals about his history of workplace accidents. The documentation of this meeting includes a warning that future violations might result in his termination. Almost four years later, Plaintiff did have another violation, and he was terminated.

Plaintiff argues that the safety reason is a pretext for intentional age discrimination. He notes that after the November 1998 meeting, he received two performance evaluations commenting positively on his safety record. Out of a possible 10 points for safety, he received "9's" on both evaluations. A notation on the second evaluation described Plaintiff as "safety conscious." In the same month he received this evaluation, he was fired because, according to Callaway, he "did not have the ability to work safely or maybe the willingness to work safely." (Def. Ex. 31.) Cf. **Gaworski v. ITT Commercial Finance Corp.**, 17 F.3d 1104, 1109 (8th Cir. 1994) (holding that jury could find non-discriminatory reasons were

pretextual in age discrimination case in which employee was replaced by younger worker who allegedly had desired trait that was noted in recent evaluation by same decision-maker to be trait of discharged employee).

This decision to terminate Plaintiff for the safety violation was not made according to any policy of Defendant. See **Peterson**, 406 F.3d at 522 (noting that "fluid standards" may give rise to an inference of unlawful discrimination). Indeed, Palmer, Norton, and Hopper were each issued a safety goal that cautioned them in language similar to that included in the documentation of Plaintiff's 1998 meeting that further violations could result in their termination. Each of the three had another violation. Palmer and Norton were involved in another violation that required medical treatment; Plaintiff's violation did not. None of the three were fired; Plaintiff was. See **Denesha**, 161 F.3d at 498 (affirming jury's verdict in favor of discharged employee whose work was judged by different criteria than the work of other employees who were not in same protected group).

Defendant notes that none of the three, nor the other employee whose record is cited by Plaintiff, had the number of safety violations that Plaintiff had. None of these had his length of service, either. The four younger employees named by Plaintiff were not terminated after being involved in a total of 15 safety incidents between 1999 and 2003. (Facts ¶¶ 100-123.) Callaway, as production manager, received accident reports for this period. (Facts ¶ 53.) Plaintiff incurred only one safety incident during this period, for which he was terminated. The aggregate average time between safety incidents for the four younger employees was 7.33 months. Individually, they averaged 5, 6.2, 7.8, and 10.33

months between safety incidents during this period. On the other hand, during Plaintiff's 21 year career with Defendant, he has averaged 28.75 months between safety incidents.

"A plaintiff may demonstrate pretext by showing that he was treated less favorably than similarly-situated employees outside of his protected group." **Pope**, 406 F.3d at 1009. "The test for determining whether employees are similarly situated is a rigorous one." **Id.** "'For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways.'" **Id.** (quoting Wheeler v. Aventis Pharms., 360 F.3d 853, 858 (8th Cir. 2004)). See also **Harvey v. Anheuser-Busch, Inc.**, 38 F.3d 968, 972-73 (8th Cir. 1994) ("To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." (interim quotations omitted)). "Further, the plaintiff must show that he and those employees outside of his protected group were similarly situated in all relevant respects." **Id.** (alterations added). Accord **Britton**, 244 F.3d at 998.

During the time Callaway was the production manager, Plaintiff had a better safety record than four younger employees who were not terminated. Whether his entire safety record was the reason for his termination or whether his age was is for the jury to decide, given the combination of the timing of the termination following the positive evaluation and just before his eligibility for retirement, the "Age" box on the incident investigation forms that apparently came into use only after Callaway was the production manager, the two re-writings of the September 2002 incident investigation report, the absence of any objective

policy on when an "unsafe act" is one too many, the continued employment of three younger employees who were also cautioned that another violation could result in their termination, and the average length of time between Plaintiff's incidents compared to the four younger workers.  See **Appelbaum v. Milwaukee Metro. Sewer Dist.**, 340 F.3d 573, 580 (8th Cir. 2003) (finding it possible for jury to infer that lay off was "tainted by considerations of age" when employee chosen to be laid-off was "on the verge of retirement eligibility" and employee chosen not to be laid off was less qualified).

### Conclusion

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." **Mayer**, 318 F.3d at 808 (interim quotations omitted).  Because "[c]redibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," **Anderson**, 477 U.S. at 255 (alteration added), on the record now before the Court, a reasonable jury could find that the Defendant's decision to terminate Plaintiff was motivated by his age, in violation of the ADEA and the MHRA.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **DENIED**.  [Doc. 27]

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of July, 2005.